UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

PLUMBERS AND PIPEFITTERS
NATIONAL PENSION FUND, Individually
and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

ALTA MESA RESOURCES, INC. f/k/a
SILVER RUN ACQUISITION
CORPORATION II, JAMES T. HACKETT,
THOMAS J. WALKER, WILLIAM D.
GUTERMUTH, JEFFREY H. TEPPER,
DIANA J. WALTERS and RIVERSTONE
INVESTMENT GROUP LLC,

Defendants.

—————————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE
SECURITIES EXCHANGE ACT OF 1934

DEMAND FOR JURY TRIAL

Plaintiff Plumbers and Pipefitters National Pension Fund ("plaintiff"), individually and on behalf of all others similarly situated, alleges violations of §14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78n(a), and SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated thereunder, and §20(a) of the Exchange Act, 15 U.S.C. §78t(a).  Plaintiff's allegations are based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Alta Mesa Resources, Inc. f/k/a Silver Run Acquisition Corporation II ("Silver Run II" or the "Company"), Company press releases and earning calls, and analyst and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PRELIMINARY STATEMENT

1.      This action arises out of defendants' dissemination of a false and misleading proxy statement in connection with the February 2018 acquisition of Alta Mesa Holdings, LP ("Alta Mesa") and Kingfisher Midstream LLC ("Kingfisher") by Silver Run II (the "Acquisition"). Plaintiff held Silver Run II Class A common stock at the close of business on January 22, 2018, the record date, and was entitled to vote on the merger.  Defendants are Silver Run II, its Board of Directors (the "Board") and Silver Run II's private equity sponsor.

2.      Silver Run II was formed in 2016 as a blank check company organized under the laws of Delaware.  Blank check companies do not have established business or operations, but rather, are formed for the purpose of effectuating a merger or acquisition with another firm or business entity. Stockholders in blank check companies depend on management to honestly provide accurate information about any contemplated transactions.

3.      On or about March 24, 2017, Silver Run II carried out an initial public offering, selling 103.5 million ownership units to investors for gross proceeds of $1.035 billion (the "IPO"). Each unit was priced at $10 and consisted of one share of Class A common stock and one-third of a warrant to purchase Class A shares.  Each whole warrant entitled the holder to purchase one share of Silver Run II Class A common stock at $11.50 per share.  The IPO was sponsored by Riverstone Investment Group LLC ("Riverstone"), a New York-based energy sector private equity firm.

4.      Defendant James T. Hackett ("Hackett") served as the Chief Executive Officer ("CEO") of Silver Run II and a member of the Board at the time of the IPO.  He was also a Senior Advisor to Riverstone at the time.   Other members of Silver Run II's management team also concurrently served as Riverstone executives, including the Company's Chief Financial Officer ("CFO"), defendant Thomas J. Walker ("Walker"), and its Corporate Secretary, Stephen S. Coats ("Coats").

5.      While Silver Run II did not identify any target companies at the time of the IPO, the offering materials stated that the Company planned to pursue an acquisition that would "capitalize on the ability of [its] management team and the broader Riverstone platform to identify, acquire and operate a business in the energy industry that may provide opportunities for attractive risk-adjusted returns."  The IPO offering materials also represented that Silver Run II would leverage its industry experience and insider knowledge to acquire "fundamentally sound" assets that were underpriced and offered Silver Run II investors attractive investment returns.

6.      Pursuant to the IPO prospectus, Silver Run II was required to acquire a target business with an aggregate fair market value of at least 80% of the assets held in trust from the IPO proceeds.  In addition, Silver Run II was obligated to redeem 100% of its outstanding public shares if it failed to complete the business combination within two years of the March 2017 IPO.

Shareholders also had the right at the time of the initial business combination to either approve the initial business combination or redeem their shares on a pro rata basis.

7.      In August 2017, Silver Run II announced that it had entered into an agreement, subject to shareholder approval, to merge with two privately held companies, Alta Mesa and Kingfisher, in a deal initially valued at $3.8 billion.  Alta Mesa was an oil and gas exploration and production company operating in the STACK play in the Anadarko Basin area of Oklahoma. Kingfisher specialized in the gathering, processing, and marketing of hydrocarbons from oil and gas producers.  The two companies were closely related and shared overlapping and affiliated owners. Kingfisher had been built to service Alta Mesa, and nearly 97% of Kingfisher's revenues derived from production out of wells operated by Alta Mesa for the year ended December 31, 2016.

8.      In early 2018, in order to secure shareholder support for the Acquisition, Silver Run II issued a materially false and misleading Definitive Merger Proxy Statement on Schedule M14A (the "Proxy").  The Proxy, which recommended that Silver Run II's shareholders vote in favor of the Acquisition, included false and/or misleading statements of fact and omitted facts necessary to make the statements made therein not false or misleading in contravention of §§14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

9.      Among other misrepresentations, the Proxy materially overstated the value of the assets to be acquired via the Acquisition and claimed that both Alta Mesa and Kingfisher were poised for substantial near-term growth.  For example, the Proxy failed to disclose operational setbacks, customer uncertainty and predictable well shutdowns as a result of planned projects commenced in late 2017, while representing: (i) that Alta Mesa was positioned to achieve a 2018 average net daily production of 38.51 MBOE/d (one thousand barrel of oil equivalent ("BOE") per day), an 85% increase over its estimated 2017 net daily production of 20.84 MBOE/d, and a 2018

adjusted EBITDA(X) of $358 million, a 131% increase over Alta Mesa's 2017 estimated adjusted EBITDA(X) of $155 million; and (ii) that Kingfisher was positioned to achieve 2018 adjusted EBITDA of $185 million, a 340% increase over Kingfisher's 2017 estimated adjusted EBITDA of $42 million.

10.     As a result of the false and misleading Proxy, which was used to induce stockholder action and resulted in substantial harm to plaintiff and Silver Run II's other shareholders, Silver Run II shareholders were prevented from making an informed decision on whether or not to redeem their shares and voted in favor of the Acquisition on February 6, 2018.  The redeemable Class A common shares were valued at approximately $10 per share at the time of the Acquisition.

11.     On February 9, 2018, Silver Run II issued a release announcing that the Acquisition had closed.

12.     Then, on March 29, 2018, less than two months after the closing of the Acquisition, Silver Run II issued a release announcing that the EBITDA and production estimates provided in the Proxy were materially overstated.  The release stated that Kingfisher was expected to post only $102.5 million in EBITDA at the midpoint of 2018, 46% below the 2018 EBITDA estimate of $185 million provided in the Proxy.  Similarly, Alta Mesa was expected to post an average net daily production of only 35.5 MBOE/d at the midpoint for the year, 8% below the production figures provided in the Proxy.  Hal Chappelle ("Chappelle"), the new CEO of the combined business (and former CEO of Alta Mesa), stated during a conference call to discuss Silver Run II's results that multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher, which pushed the Company's timeline for growing its pipeline business back by six months and a possible public offering of the asset "perhaps" into 2019.  Even though the setbacks had not been disclosed in the Proxy, Chappelle admitted that these "setbacks" began in "late 2017."

13.     On August 14, 2018, Silver Run II provided its second quarter 2018 financial results, again posting disappointing results and slashing its outlook in the midst of numerous operational setbacks.  Rather than the hyperbolic growth portrayed in the Proxy, Silver Run II revealed that Alta Mesa's oil production had actually declined sequentially during the quarter and that it now expected to achieve average daily net production of only 30.0 MBOE/d at the midpoint for 2018, 22% below the estimates provided in the Proxy.  Far from the reliable and consistent well production represented to investors in the Proxy to induce them to approve the Acquisition, Silver Run II revealed that throughout 2018 Alta Mesa's wells had suffered from repeated "shut-ins" or restricted production caps, resulting in an average daily loss of thousands of BOE.

14.     On an earnings call to discuss the results, Alta Mesa's Vice President of Operations revealed that the shut-ins resulted from work done or planned "back in the fourth quarter of '17," which problems "linger[ed] into the first quarter of '18."  Notwithstanding the fact that these projects were planned and implemented prior to the Acquisition, their adverse effects were omitted from the Proxy.  Furthermore, Silver Run II revealed that its Kingfisher operations were not on track to achieve even the drastically reduced March 2018 guidance.  Notably, Silver Run II refused to provide any revised guidance for Kingfisher during the call, an indication that third-party producers had largely abandoned the use of Kingfisher's pipeline services.  The Proxy had valued the consideration to be paid for Kingfisher at over $1.4 billion (including $800 million in cash) based, in part, on a 2018 EBITDA estimate of $185 million.  However, Kingfisher actually generated only $9.2 million of EBITDA in the first six months of 2018, which implied a full-year EBITDA of only $18.4 million, more than 90% below the estimate provided in the Proxy.

15.     On November 13, 2018, Silver Run II issued a release providing its third quarter 2018 financial results.  The release also stated that Michael A. McCabe ("McCabe"), the Company's CFO,

was retiring.  Approximately one month later, in December 2018, Silver Run II also announced the sudden resignation of its CEO, Chappelle, and Michael E. Ellis ("Ellis"), Vice President and Chief Operating Officer-Upstream.

16.     The value of the Class A common stock held by plaintiff and other members of the Class (as defined below) declined substantially in value subsequent and due to the approval of the Acquisition, causing economic loss and damages as the truth about Alta Mesa and Kingfisher and the Proxy's false and misleading nature were revealed over time.  By December 2018, the price of Silver Run II Class A common stock was trading below $1 per share, a 90% decline from the price shareholders would have received had they redeemed their shares instead of approving the Acquisition.

17.     This action seeks damages on behalf of Silver Run II's stockholders incurred as a result of defendants' materially misleading Proxy disseminated in contravention of §§14(a) and 20(a) of the Exchange Act.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act for violations of §§14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§78n(a) and 78t(a), and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9, and 28 U.S.C. §1331.

19.     This Court has personal jurisdiction over each of the defendants because each is an entity that conducts business in and maintains operations in New York, has purposefully directed its activities toward New York, or is an individual who has sufficient minimum contacts with New York so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  In addition, defendants committed the unlawful acts complained of herein in New York.

20.     Venue in this case is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  Acts giving rise to the violations of law complained of herein, including the dissemination of false and misleading information to the investing public, occurred in this District.  In addition, Riverstone is headquartered in this District and the Silver Run II Class A common stock that is the subject of this action trades in this District.

## PARTIES

21.     Plaintiff Plumbers and Pipefitters National Pension Fund was a holder of record of Silver Run II Class A common stock as of the January 22, 2018 record date for the Acquisition, as detailed in the attached Certification incorporated herein, and was entitled to notice of the special meeting and to vote at the special meeting.

22.     Defendant Alta Mesa Resources, Inc. ("Silver Run II") is an oil and natural gas company incorporated in Delaware focused on the acquisition, development, exploration and exploitation of unconventional onshore oil and natural gas reserves in the eastern portion of the Anadarko Basin in Oklahoma.  Its Class A common shares trade in New York on the NASDAQ under the symbol "AMR" and its public warrants trade in New York on the NASDAQ under the symbol "AMRWW."  Prior to the Acquisition, Silver Run II's Class A stock traded under the symbol "SRUN," its public warrants traded under the symbol "SRUNW," and its ownership units, which contained both stock and fractional warrants, traded under the symbol "SRUNU."

23.     Defendant James T. Hackett ("Hackett") was the CEO and a director of Silver Run II prior to the Acquisition and became Executive Chairman of the Board after the initial business combination.  He was appointed Interim CEO of Silver Run II after the resignation of Chappelle.  He was also the Chief Operating Officer ("COO") of Silver Run II's Midstream business immediately following the Acquisition, and in April 2018 became Kingfisher's President and CEO. Hackett spent

decades as an oil executive before joining Riverstone in 2013 and was a Riverstone Senior Advisor at the time of the Acquisition.

24.     Defendant Thomas J. Walker ("Walker") served as the CFO of Silver Run II prior to the Acquisition.  At the time, Walker was also the CFO and a Partner of Riverstone.  He was replaced as CFO of Silver Run II by McCabe following the Acquisition.

25.     Defendant William Gutermuth ("Gutermuth") served as a member of the Board at the time of the Acquisition.

26.     Defendant Jeffrey H. Tepper ("Tepper") served as a member of the Board at the time of the Acquisition.

27.     Defendant Diana J. Walters ("Walters") served as a member of the Board at the time of the Acquisition.

28.     The defendants named in ¶¶23-27 are referred to herein as the "Individual Defendants."

29.     Defendant Riverstone Investment Group LLC is a private equity firm focused on the energy sector.  It sponsored the IPO and the Acquisition through various related affiliates and investment vehicles.

30.     Each of the defendants participated in the preparation, review and dissemination of the materially misleading Proxy complained of herein. The Individual Defendants abdicated their duty to file and distribute to plaintiff and the Class a Proxy that was not misleading.

## SUBSTANTIVE ALLEGATIONS

**Background of Silver Run II**

31.     Silver Run II was formed in 2016 as a blank check company for the specific purpose of acquiring economically sound assets in the energy sector that offered attractive risk-adjusted returns for investors.  On or about March 24, 2017, Silver Run II completed its IPO, selling 103.5

million ownership units to investors for gross proceeds of $1.035 billion.  Each unit was priced at $10 and consisted of one share of Class A common stock and one-third of a warrant to purchase Class A shares.  Each whole warrant entitled the holder to purchase one share of Silver Run II Class A common stock at $11.50 per share.  The IPO was sponsored by Riverstone, a New York-based energy sector private equity firm.

32.     Defendant Hackett served as CEO and a member of the Board of Silver Run II at the time of the IPO.  Hackett is the former Chairman and CEO of the Anadarko Petroleum Corporation and, at the time of the IPO, served as a Senior Advisor to Riverstone.  Other members of Silver Run II's management team also concurrently served as Riverstone executives.  For example, the Company's CFO, defendant Walker, was a Partner at Riverstone and served as its CFO.  Likewise, Coats, the Corporate Secretary of Silver Run II, was a Partner at Riverstone and served as its General Counsel.

33.     While Silver Run II did not identify any target companies at the time of the IPO, the IPO offering materials stated that the Company planned to pursue an acquisition that would "capitalize on the ability of [its] management team and the broader Riverstone platform to identify, acquire and operate a business in the energy industry that may provide opportunities for attractive risk-adjusted returns."  The IPO offering materials repeatedly stated that Silver Run II would leverage its industry experience and insider knowledge to acquire "fundamentally sound" assets that were underpriced and offered attractive investment returns.

34.     The "acquisition criteria" for Silver Run II provided in its IPO offering materials included investing in companies or assets that:

- can utilize the extensive networks and insights we have built in the energy industry;

- are *at an inflection point*, such as requiring additional management expertise, are able to innovate through new operational techniques, or where we believe we can *drive improved financial performance*;

- are *fundamentally sound companies* that are underperforming their potential;

- *exhibit unrecognized value* or other characteristics, *desirable returns on capital*, and a need for capital to achieve the company's growth strategy, that we believe have been *misevaluated by the marketplace based on our analysis and due diligence review*; and

- *will offer an attractive risk-adjusted return for our stockholders*. We will seek to acquire the target on terms and in a manner that leverages our management team's experience investing within the energy industry. Potential upside from growth in the target business and an improved capital structure will be weighed against any identified downside risks.

35.     Pursuant to the IPO prospectus, Silver Run II was required to acquire a target business with an aggregate fair market value of at least 80% of the assets held in trust from the IPO proceeds and to do so within two years of the March 2017 IPO.  In the event Silver Run II did not complete an initial business combination, the Company was obligated to redeem 100% of its outstanding public shares.  Moreover, shareholders could redeem their shares at the time of the initial business combination if they did not want to retain a continuing interest in the business after the transaction.  If enough shareholders redeemed their shares, a deal would not be economically feasible.

36.     In August 2017, Silver Run II announced that it had entered into a preliminary agreement, subject to shareholder approval, to merge with Alta Mesa and Kingfisher in a deal initially valued at $3.8 billion.  Alta Mesa and Kingfisher were closely related and shared overlapping and/or affiliated owners.  Alta Mesa was an oil and gas exploration and production company operating in the STACK play in the Anadarko Basin area of Oklahoma, and Kingfisher specialized in the gathering, processing and marketing of hydrocarbons from oil and gas producers.

Nearly 97% of Kingfisher's revenue derived from production out of wells operated by Alta Mesa for the year ended December 31, 2016.

37.     In the Acquisition, Silver Run II, Riverstone and the owners of Kingfisher and Alta Mesa, through certain affiliates and investment vehicles, would each receive common units in a newly formed operating subsidiary, SRII Opco, LP ("SRII Opco"), pursuant to various contribution agreements (the "SRII Units").  Each contributor other than Silver Run II would also receive corresponding shares of newly created Class C common stock, which entitled its holders to vote on par with Class A and Class B shares but provided no economic interest in Silver Run II.

38.     Specifically, under the contribution agreement that Silver Run II entered into with Alta Mesa, Alta Mesa's owners would receive 220 million SRII Units (and a corresponding number of Class C shares), subject to certain adjustments, and the right to receive an aggregate of up to $800 million in additional earn-out compensation.  Silver Run II also agreed to contribute $400 million in cash to Alta Mesa.  The preliminary purchase price consideration for Alta Mesa was estimated in the Proxy to be approximately $1.864 billion.

39.     Under the contribution agreement that Silver Run II entered into with Kingfisher, Kingfisher's owners would receive 55 million SRII Units (and a corresponding number of Class C shares), $800 million in cash, and the right to receive an aggregate of up to $200 million in additional earn-out compensation.  As detailed in the Proxy, the owners of Kingfisher (who largely overlapped with Alta Mesa's owners) had insisted on receiving a large cash payout from the Acquisition rather than taking additional equity in the surviving business.  The preliminary purchase price consideration for Kingfisher was estimated in the Proxy to be approximately $1.439 billion.

40.     Following the Acquisition, the owners of Kingfisher and Alta Mesa would collectively own 50.7% of the voting shares in Silver Run II and 50.7% of the SRII Units.  Certain of

these owners and their affiliates would also retain a 10% interest in the general partner of Alta Mesa and receive shares of newly issued Series A Preferred Stock entitling them to collectively nominate and elect up to four directors to the Board.  The Board, meanwhile, would be expanded to eleven members.

41.     In the Acquisition, Riverstone was to receive 20 million SRII Units (and a corresponding number of Class C shares) pursuant to a separate contribution agreement it had entered into with Silver Run II, in addition to the ownership and voting rights it had secured in the IPO.  In total, Riverstone and its affiliates would receive approximately 22.3% of the voting interest and 38.9% of the economic interest in Silver Run II, minus certain interests held by the non-employee members of the Board through their ownership of Class B shares.  In addition, Riverstone would receive a 5.2% interest in SRII Opco and one share of newly issued Series B Preferred Stock entitling it to nominate and elect up to three directors to the Board.  Riverstone also caused Silver Run II to enter into a Tax Receivables Agreement that entitled Riverstone and the owners of Alta Mesa to receive cash payments from Silver Run II equal to 85% of the amount of tax savings realized by the Company in certain circumstances.

42.     Silver Run II, meanwhile, would contribute the proceeds from the IPO to the business and, in exchange, receive a 44.1% limited partner interest in SRII Opco, control over the general partner of SRII Opco and a 90% interest in the general partner for Alta Mesa.  Immediately following the Acquisition, the existing public shareholders of Silver Run II would hold only 26.9% of the voting stock in Silver Run II and the ability to elect a minority of the Board.  Despite their lack of control over the Company, Silver Run II's shareholders would be exposed to 61.1% of its economic risk.

43.     Riverstone's and Alta Mesa's officers and directors were incentivized to close the Acquisition.  If they failed to secure an initial business combination by March 29, 2019, according to the Proxy, "[Riverstone and our] officers and directors will lose their entire investment."  Instead, Silver Run II would be wound up and Riverstone would be obligated to redeem 100% of the Company's public shares at a per share price, payable in cash.  Negotiations regarding the Acquisition had been ongoing since at least March 2017 – shortly after the IPO – and, according to the Proxy, involved the consideration of "multiple alternative target opportunities."  Given the extended duration of these negotiations, and the fact that Riverstone purportedly found all of the alternatives it considered to be unsuitable for an initial business combination, it is unlikely that Riverstone would have been able to complete an alternative business combination within the requisite time period if shareholders did not vote to approve the Acquisition.

## THE FALSE AND MISLEADING PROXY

44.     On January 19, 2018, Silver Run II issued a Definitive Merger Proxy Statement to its shareholders on Schedule 14A in connection with the efforts of Silver Run II, the Board and Riverstone to secure shareholder support for the Acquisition.  The Proxy recommended that Silver Run II's shareholders vote in favor of the Acquisition while omitting and misrepresenting material information concerning core aspects of Alta Mesa and Kingfisher that diminished their future expected cash flows.

45.     The Proxy stated that Alta Mesa and Kingfisher satisfied the acquisition criteria outlined in the IPO offering materials.  The Proxy further stated that Riverstone and Silver Run II had considered, and rejected, "multiple alternative target opportunities" because a variety of factors, and provided reasons for shareholders to approve the Acquisition, including, *inter alia*, that "Alta Mesa and Kingfisher were of ***superior quality***" and that "the alternative options ***did not entirely fit the investment criteria*** of Silver Run" or the "***valuation expectations***" of Hackett and Riverstone.

Thus, the Proxy represented that the Acquisition fit all of the investment criteria outlined in the IPO offering materials and that Alta Mesa and Kingfisher offered significant value and high quality assets to shareholders of Silver Run II with attractive risk-adjusted returns.

46.     Similarly, the Proxy stated that the Board's recommendation that shareholders vote "FOR" the business combination was based on "careful consideration" and extensive due diligence. The Proxy stated that the Board had considered "a wide variety of factors in connection with its evaluation of the business combination" and had determined that the following factors, among others, supported its recommendation that shareholders vote in favor of the Acquisition:

- *Alta Mesa's Highly Contiguous Acreage in the STACK*.  Alta Mesa has approximately 130,000 highly contiguous acres in the up-dip oil window of the STACK, one of the most active and prolific stacked pay basins in North America.  In addition, Alta Mesa's deep inventory includes over 4,000 primary gross locations and over 12,000 possible locations from down spacing, as well as additional zone penetration.

- *World Class Asset with Attractive Geology*.  Alta Mesa's oil-weighted resource features high margins, low break-even commodity prices, and single-well rates of return in excess of 85%.  Silver Run and Alta Mesa's management believe there are ***further opportunities for improving efficiencies through technology and optimizing well design***.

- *Top-Tier Operator with Substantial STACK Expertise and Highly Consistent Well Results*.  Alta Mesa's management has over 30 years' of experience operating in the STACK, and Silver Run believes that ***this experience provides Alta Mesa with a competitive advantage.***  As of September 30, 2017, Alta Mesa has drilled more than 220 horizontal STACK wells, and currently has a multi-rig program, averaging six rigs in 2017.  ***Of the 220 wells drilled, over 183 were on production, and of that number, about 116 had sufficient production history to give Alta Mesa's management confidence that Alta Mesa's type well EUR is greater than 650 MBOE***.

- *Highly Strategic and Synergistic Midstream Platform*.  Kingfisher's midstream assets overlay Alta Mesa's contiguous acreage in the STACK, and afford Alta Mesa with a purpose-built system to handle larger volumes in an efficient processing system.  Kingfisher's system allows Alta Mesa to access Midwest and Gulf Coast markets through the Panhandle Eastern Pipeline, as well as western interstate markets through OGT.  ***In addition to serving Alta Mesa, Kingfisher has grown its customer base since its inception to include other active producers that have provided acreage dedications.  Silver Run***

*believes that Kingfisher offers a unique opportunity to own a rapidly expanding midstream business underpinned by 10 to 15 year acreage dedications early in their term and that Kingfisher also has the potential for a subsequent midstream initial public offering.*

- *Strong Liquidity Profile*.  After giving effect to the business combination, Silver Run expects to have **sufficient liquidity and financial flexibility to fund Alta Mesa's and Kingfisher's development projects and pursue opportunistic acquisitions**.

- *Terms of the Contribution Agreement*.  Silver Run's board of directors reviewed the financial and other terms of the Contribution Agreements and determined that they were the **product of arm's-length negotiations among the parties**.

47.    The Proxy also emphasized several characteristics of Alta Mesa and Kingfisher, including that:

(i)    ***Alta Mesa had assembled an attractive, large, contiguous position*** in the up-dip, naturally-fractured oil portion of the STACK, one of the most active and prolific basins in North America, (ii)  ***Alta Mesa had a large, highly economic horizontal drilling inventory across multiple pay zones with low oil price breakevens***, (iii) ***Alta Mesa had an experienced management team with proven horizontal drilling expertise and technical acumen*** in the STACK, (iv)  ***Kingfisher had developed a strong, local midstream system underpinned by long-term acreage dedication contracts from multiple active producers, as well as firm takeaway contracts*** on key pipelines, (v) ***Kingfisher was well-positioned to benefit from increasing upstream development*** activity in an active and prolific basin with ***upside potential*** from further expansion projects, (vi) ***Kingfisher would serve as a natural complement to Alta Mesa*** given the relationship between the two businesses, and (vii)  there was ***significant upside*** in the completion of the Kingfisher system and the ***potential for a subsequent midstream initial public offering***.

48.    In addition, the Proxy stated that Alta Mesa "was operating six horizontal drilling rigs in the STACK with plans to continue to operate that number of rigs through the end of 2017."

49.    The Proxy further stated that Alta Mesa and Kingfisher were poised for accelerating growth immediately following the Acquisition.  For example, the Proxy stated that Alta Mesa had achieved an estimated 2017 average net daily production of 20.8 MBOE/d and was expected to increase its 2018 average net daily production to 38.5 MBOE/d and its 2019 average net daily production to 68.9 MBOE/d.

50.     In addition, the Proxy stated that Alta Mesa had achieved 2017 adjusted EBITDAX of $155 million and was expected to increase its 2018 adjusted EBITDAX to $358 million and its 2019 adjusted EBITDAX to $701 million.

51.     Likewise, the Proxy stated that Kingfisher was estimated to have achieved $42 million in 2017 EBITDA and was expected to increase its 2018 EBITDA to $185 million and its 2019 EBITDA to $318 million.

52.     The Proxy provided the following charts, which contained key historical operational and financial metrics for 2017 and represented that Alta Mesa and Kingfisher were generating strong 2018 growth rates in both adjusted EBITDA and CapEx, stating:

**Alta Mesa Projections**

| | Year Ending December 31, | | |
| | 2017E | 2018E | 2019E |
| | | ($ in millions) | |
|---|---|---|---|
| Average Net Daily Production (Boe/d) | 20,841 | 38,510 | 68,900 |
| Adjusted EBITDAX | $ 155 | $ 358 | $ 701 |
| Capital Expenditures | $ 349 | $ 552 | $ 611 |
| Free Cash Flow | $ (237) | $ (233) | $ 51 |

\*          \*          \*

**Kingfisher Projections**

| | Year Ending December 31, | | |
| | 2017E | 2018E | 2019E |
| | | ($ in millions) | |
|---|---|---|---|
| Adjusted EBITDA | $ 42 | $ 185 | $ 318 |
| Capital Expenditures | $ 124 | $ 373 | $ 174 |
| Free Cash Flow | $ (83) | $ (189) | $ 144 |

(Footnotes omitted.)

53.     Notably, the Proxy stated that these "financial projections **were prepared on a reasonable basis**" and "**reflected the best currently available estimates and judgments** of Alta Mesa and Kingfisher, as applicable." Moreover, the Proxy represented that these financial figures

"presented, to the best of their knowledge and belief, the ***expected course of action and the expected future financial performance of Alta Mesa and Kingfisher***, respectively."   In other words, the Proxy represented to investors that the estimates and projections contained therein were based on observable trends and capabilities and economically justified assumptions regarding the expected cash flows of Alta Mesa and Kingfisher.  The Proxy further stated that "the Silver Run board of directors used the . . . projections as a tool in evaluating the business combination."  The Proxy also stated that, after using this evaluation "tool," the Board had recommended that Silver Run II stockholders "vote 'FOR' the Business Combination Proposal."  Thus, the projections provided in the Proxy, which mirrored information provided in earlier public investor solicitation efforts, were used to induce shareholders to vote in favor of the Acquisition and to forgo redeeming their shares, notwithstanding boilerplate disclaimers in the Proxy.

54.     The statements in ¶¶44-53 contained in the Proxy were materially misleading when made.  Specifically, the Proxy omitted and/or misrepresented the material information set forth below in contravention of §§14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9:

(a)     That Alta Mesa and Kingfisher did not possess "superior quality" and "[w]orld [c]lass" assets as compared to other operators in the oil and gas industry;

(b)     That Alta Mesa faced significant operational setbacks;

(c)     That several major oil producers had steered assets away from production in the STACK region;

(d)     That the Board and Riverstone had not sought a deal in the best interests of Silver Run II's public shareholders and in accord with the acquisition criteria outlined in the IPO offering materials, but rather to serve their own financial interests;

(e)     That, as a result of (a)-(d) above, Kingfisher and Alta Mesa were not on track to achieve the earnings and production estimates provided in the Proxy and defendants had no reasonable basis to believe and did not believe that Kingfisher and Alta Mesa would achieve these estimates; and

(f)     That, as a result of (a)-(e) above, the Board's purported reasons for shareholders to vote "FOR" the Acquisition provided in the Proxy omitted material facts necessary to make the statements made therein not false or misleading.

### EVENTS FOLLOWING THE ISSUANCE OF THE PROXY

55.     As a result of the materially misleading Proxy, Silver Run II stockholders voted in favor of the Acquisition at a special shareholders meeting held in New York City on February 6, 2018.  Of shareholder votes cast, over 98% voted in favor of the Acquisition.   These shareholders were also prevented from the fully informed opportunity to redeem their shares as was their right. The shares subject to redemption were valued in the Proxy at approximately $10 per share.

56.     The false and misleading Proxy induced stockholder action that resulted in substantial harm to plaintiff and Silver Run II's other shareholders.   Specifically, the material misrepresentations and omissions in the Proxy were an essential link in the approval of the Acquisition, and the Class A common stock held by plaintiff and other Class members declined substantially in value subsequent and due to the approval of the Acquisition, causing economic loss and damages.

57.     After the stockholder vote, on February 9, 2018, Silver Run II issued a release announcing that the Acquisition had closed.

58.     Then, on March 29, 2018, Silver Run II issued a release announcing its 2017 financial results.  The release disclosed that EBITDA and production estimates provided in the Proxy had been dramatically reduced.  The release revealed that Kingfisher was expected to post only $102.5

million in EBITDA at the midpoint of 2018, *46% below the 2018 EBITDA estimate of $185 million provided in the Proxy*.  In addition, the release revealed that Alta Mesa was expected to post an average net daily production of only 35.5 MBOE/d at the midpoint for the year, *8% below* the production figures provided in the Proxy.

59.     During a conference call to discuss the results, Chappelle, the CEO of the combined business (and former CEO of Alta Mesa), stated that multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher, which pushed Silver Run II's timeline for growing its pipeline business back by six months and a possible public offering of Kingfisher "perhaps" into 2019.  *Even though they had not been disclosed in the Proxy*, Chappelle admitted that these "setbacks" began in "late 2017."

60.     On August 14, 2018, Silver Run II provided its second quarter 2018 financials, again posting disappointing results and slashing its outlook in the midst of numerous operational setbacks. The Company revealed that Alta Mesa's oil production had actually *declined sequentially* during the quarter and that it now expected to achieve average daily net production of only 30.0 MBOE/d at the midpoint for 2018, *22% below the estimates provided in the Proxy*.  Far from the reliable and consistent well production represented to investors in the Proxy to induce them to approve the Acquisition, Silver Run II revealed that throughout 2018 Alta Mesa's wells had suffered from repeated shut-ins averaging the loss of thousands of BOE every day and that the adverse trend had been worsening.

61.     On an earnings call to discuss the results, Alta Mesa's Vice President of Operations revealed that the shut-ins resulted from work done or planned "*back in the fourth quarter of '17*," which problems had "*linger[ed] into the first quarter of '18*."  Despite resulting from work that pre-dated the Acquisition, these adverse effects were omitted from the Proxy.  Moreover, Silver Run II

revealed that its Kingfisher operations were not on track to achieve even the drastically reduced March 2018 guidance. Indeed, the Company refused to provide *any* revised guidance for Kingfisher, indicating that third-party producers had largely abandoned the use of its pipeline services. Kingfisher – an asset that the Proxy had valued at over $1.4 billion based, in part, on a 2018 EBITDA estimate of $185 million and for which shareholders had paid $800 million in cash – had generated only *$9.2 million* in EBITDA during the first six months of 2018.

62.     On November 13, 2018, Silver Run II issued a release providing its third quarter 2018 financial results. The release stated that the Company's CFO, McCabe, was retiring. Approximately one month later, in December 2018, Silver Run II also announced the sudden resignation of its CEO, Chappelle, and Ellis, Vice President and COO-Upstream.

63.     Subsequent to, and due to, the closing of the Acquisition, the price of Silver Run II Class A common stock declined precipitously as the truth about Alta Mesa and Kingfisher and the Proxy's false and misleading nature were revealed over time. By December 2018, the price of Silver Run II Class A common stock was trading below $1 per share, 90% below the price shareholders would have received if they had redeemed their shares instead of approving the Acquisition less than one year earlier.

64.     This action seeks damages on behalf of Silver Run II's stockholders incurred as a result of the defendants' dissemination of the materially misleading Proxy in contravention of §§14(a) and 20(a) of the Exchange Act.

## CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf all holders of record of Silver Run II Class A common stock at the close of business on January 22, 2018, the record date to vote on the Acquisition, excluding defendants and their affiliates (the "Class"). This action is properly maintainable as a class action for the reasons set forth below.

66. The Class is so numerous that joinder of all members is impracticable. According to the Proxy, there were approximately 103.5 million public shares of Silver Run II Class A stock issued and outstanding at the time of the Acquisition, likely held by thousands of persons.

67. There are questions of law and fact that are common to the Class, including:

(a)     whether defendants violated §14(a) of the Exchange Act by misrepresenting or omitting material information in the Proxy;

(b)     whether Riverstone and the Individual Defendants are liable as "controlling persons" under §20(a) of the Exchange Act; and

(c)     whether plaintiff and the other members of the Class were injured as a result of defendants' misconduct.

68. Plaintiff's claims are typical of the claims of the other members of the Class, and plaintiff is not subject to any atypical claims or defenses.

69. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

## COUNT I

### For Violations of §14(a) of the Exchange Act and Rule 14a-9
### Promulgated Thereunder Against All Defendants

70. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

71. This Count does not sound in fraud. Plaintiff does not allege that defendants had scienter or fraudulent intent as they are not elements of a §14(a) claim.

- 21 -

72.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

73.    Defendants prepared and disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

74.    By virtue of their positions within Silver Run II and their due diligence regarding the Acquisition, defendants were aware of this information and of their duty to disclose this information in the Proxy.  The Proxy was prepared, reviewed, and/or disseminated by Silver Run II, the Board and Riverstone.  The Proxy misrepresented and/or omitted material facts, as detailed above. Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

75.    As stated herein, the Proxy contained untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  The Proxy was an essential link in the consummation of the Acquisition.  The defendants also failed to correct the Proxy prior to the Acquisition and the failure to update and correct false statements is also a violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

76.     As a direct result of the defendants' negligent preparation, review and dissemination of the false and/or misleading Proxy, plaintiff and the Class were precluded from exercising their right to seek redemption of their Silver Run II shares prior to the Acquisition on a fully informed basis and were induced to vote their shares and accept inadequate consideration in connection with the Acquisition.  The false and misleading Proxy used to obtain shareholder approval of the Acquisition deprived plaintiff and the Class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their Silver Run II shares.  At all times relevant to the dissemination of the materially false and/or misleading Proxy, defendants were aware of and/or had access to the true facts concerning the true value of Alta Mesa and Kingfisher, which was far below the assets that shareholders received.  Thus, as a direct and proximate result of the dissemination of the false and misleading Proxy defendants used to obtain shareholder approval of and thereby consummate the Acquisition, plaintiff and the Class have suffered damage and actual economic losses in an amount to be determined at trial.

77.     The omissions and false and misleading statements in the Proxy were material in that a reasonable stockholder would have considered them important in deciding how to vote on the Acquisition.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

78.     By reason of the foregoing, defendants have violated §14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

- 23 -

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against Riverstone and the Individual Defendants

79.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

80.     Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of" the Exchange Act or any of the rules promulgated thereunder.  Such "controlling persons" are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

81.     By reason of the allegations herein, Riverstone and the Individual Defendants violated §14(a) of the Exchange Act by issuing and publishing the Proxy, which contained untrue statements of material fact concerning the Acquisition and omitted to state material facts concerning the Acquisition necessary in order to make the statements made in the Proxy not misleading.

82.     Riverstone and the Individual Defendants were controlling persons of Silver Run II within the meaning of §20(a) of the Exchange Act.

83.     The Individual Defendants, by virtue of their high-level positions as officers and/or directors of Silver Run II, participated in the operation and management of Silver Run II, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs, and therefore exercised general control over the operations of Silver Run II.  The Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Silver Run II, including the identification of target companies to be acquired by Silver Run II, the evaluation of Alta Mesa and Kingfisher, and the content and

dissemination of the Proxy, which plaintiff contends was false and misleading. As stated in the Proxy, Silver Run II "is, and after the Closing [of the Acquisition] will continue to be, managed by its board of directors," which included all of the Individual Defendants except defendant Walker (Silver Run II's then-CFO and CFO of Riverstone).

84.     Likewise, Riverstone, as the private equity sponsor of the IPO and the Acquisition, and due to its influence and control over the Board, ownership of Silver Run II shares and historical relationships with Silver Run II's management, exercised general control over the operations of the Company and its business affairs.  Riverstone, either directly or indirectly through its affiliates, established Silver Run II, selected Silver Run II's management and the members of the Board, granted itself substantial benefits in the IPO and the Acquisition, participated in the identification of target companies to be acquired by Silver Run II, evaluated Alta Mesa and Kingfisher, and influenced and controlled the drafting of the Proxy, which plaintiff contends was false and misleading.

85.     Riverstone and the Individual Defendants, by virtue of their positions as owners, officers and/or directors of Silver Run II, had the power or ability to control the issuance, publication and contents of the Proxy.  Riverstone and the Individual Defendants were each involved in negotiating, reviewing and approving the Acquisition.  The Proxy purports to describe the various issues and information that Riverstone and the Individual Defendants reviewed and considered concerning the Acquisition.

86.     Riverstone and the Individual Defendants, by virtue of their positions as owners, officers and/or directors of Silver Run II, had the ability to prevent the issuance of the materially misleading Proxy or to cause the Proxy to be corrected so that it was not in violation of §14(a) of the Exchange Act.

87.     By virtue of the foregoing, Riverstone and the Individual Defendants violated §20(a) of the Exchange Act, and plaintiff is entitled to relief.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment and relief as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Declaring that the Proxy distributed by defendants to shareholders was materially false and misleading, in violation of Rule 14a-9 and §14(a) of the Exchange Act;

C.      Awarding plaintiff and the members of the Class compensatory and/or rescissory damages against the defendants;

D.      Awarding plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

E.      Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all matters so triable.

DATED: January 30, 2019                 ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                        SAMUEL H. RUDMAN
                                        ROBERT M. ROTHMAN


                                        _____
                                           */s/ Samuel H. Rudman*
                                        SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
rrothman@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com

O'DONOGHUE & O'DONOGHUE LLP
LOUIS P. MALONE
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015
Telephone:  202/362-0041
202/362-2640 (fax)

Attorneys for Plaintiff

I:\Admin\CptDraft\Securities\Cpt Alta Mesa.docx

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

PLUMBERS AND PIPEFITTERS NATIONAL PENSION FUND ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff held 105,047 shares of Silver Run Acquisition Corporation II Class A common stock at the close of business on the record date, January 22, 2018.

5.     (a)     Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Nieves v. Performance Sports Group, Ltd.*, et al., No. 1-16-cv-3591 (S.D.N.Y.)
*Scheufele, et al. v. Tableau Software, Inc., et al.*, No. 1:17-cv-05753 (S.D.N.Y.)

(b)     Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*French v. CBL & Associates Properties, Inc., et al.*, No. 1:16-cv-0165 (E.D. Tenn.)

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of January, 2019.

PLUMBERS AND PIPEFITTERS NATIONAL
PENSION FUND

By: _____
Toni C. Inscoe, Fund Administrator

ALTA MESA