UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PLUMBERS AND PIPEFITTERS NATIONAL PENSION FUND, Individually, and on Behalf of all Others Similarly Situated,<br><br>Plaintiff(s),<br><br>v.<br><br>ALTA MESA RESOURCES, INC. f/k/a SILVER RUN ACQUISITION CORPORATION II, JAMES T. HACKETT, THOMAS J. WALKER, WILLIAM D. GUTERMUTH, JEFFREY H. TEPPER, DIANA J. WALTERS and RIVERSTONE INVESTMENT GROUP LLC,<br><br>Defendant(s). | Civil Action No. 1:19-cv-00920-LLS<br><br><u>CLASS ACTION</u><br><br><u>ORAL ARGUMENT REQUESTED</u> |

**<u>MEMORANDUM OF LAW IN SUPPORT OF MOTION OF CAMELOT EVENT DRIVEN FUND, A SERIES OF FRANK FUNDS TRUST FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF ITS SELECTION OF LEAD COUNSEL</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................... ii

PRELIMINARY STATEMENT .....................................................................................................1

FACTUAL BACKGROUND ..........................................................................................................3

ARGUMENT .................................................................................................................................10

I.   CAMELOT SHOULD BE APPOINTED LEAD PLAINTIFF ...........................................10

    A.   The PSLRA Standard for Appointing Lead Plaintiff....................................................10

    B.   Camelot Is The "Most Adequate Plaintiff"...................................................................11

        1.   Camelot's Motion Is Timely ...................................................................................11

        2.   Camelot Has a Substantial Financial Interest .........................................................12

        3.   Camelot Satisfies Rule 23's Typicality and Adequacy Requirements .................................................................................................................12

            (a)   Camelot's Claims Are Typical of Those of the Class................................13

            (b)   Camelot Satisfies the Adequacy Requirement of Rule 23.........................13

II.  CAMELOT'S SELECTION OF LEAD COUNSEL MERITS APPROVAL .....................14

CONCLUSION ..............................................................................................................................15

**Table of Authorities**

Page(s)

**Cases**

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001) ............................................................................................... 14

*City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
  269 F.R.D. 291 (S.D.N.Y. 2010) ........................................................................................ 12

*In re Elan Corp. Sec. Litig.*,
  No. 1:08-cv-08761-AKH, 2009 WL 1321167 (S.D.N.Y. May 11, 2009) ..................... 13, 14

*Faig v. Bioscrip, Inc.*,
  No. 13 Civ. 06922 (AJN), 2013 WL 6705045 (S.D.N.Y. Dec. 19, 2013) ...................... 12, 13

*Foley v. Transocean Ltd.*,
  272 F.R.D. 126 (S.D.N.Y. 2011) ........................................................................................ 11

*Ho v. NQ Mobile, Inc.* (*NQ Mobile*),
  No. 13-Civ.-7608(WHP), 2014 WL 1389636 (S.D.N.Y. Apr. 9, 2014) .............................. 11

*Kemp v. Universal Am. Fin. Corp.*,
  No. 05 Civ. 9883 (JFK), 2006 WL 1190691 (S.D.N.Y. May 1, 2006) ................................ 12

*Kux-Kardos v. VimpelCom, Ltd.*,
  151 F. Supp. 3d 471 (S.D.N.Y. 2016) ............................................................................ 12, 13

*Micholle v. Ophthotech Corp.*,
  No. 17-CV-210 (VSB), 2018 WL 1307285 (S.D.N.Y. Mar. 13, 2018) ........................ 11, 13

*Randall v. Fifth St. Fin. Corp.*,
  No. 15-cv-7759, 2016 WL 462479 (S.D.N.Y. Feb. 1, 2016) .............................................. 12

*In re Third Ave. Mgmt. LLC Sec. Litig.*,
  No. 16-cv-02758 (PKC), 2016 WL 2986235 (S.D.N.Y. May 13, 2016) ............................. 12

**Rules & Statutes**

Fed. R. Civ. P. 23 .................................................................................................................. *passim*

15 U.S.C. § 78u-4 *et seq*. ..................................................................................................... *passim*

**Docketed Cases**

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
  No. 04-cv-8141 (S.D.N.Y.) ..................................................................................................15

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
  No. 08-md-1963 (S.D.N.Y.) .................................................................................................15

*In re Fannie Mae 2008 Sec. Litig.*,
  No. 08-cv-7831 (S.D.N.Y.) ..................................................................................................15

*In re Satyam Comput. Servs. Ltd. Sec. Litig.*,
  No. 09-md-2027 (S.D.N.Y.) .................................................................................................15

**Other Authorities**

H.R. Conf. Rep. No. 104-369  (1995), *reprinted in* 1995 U.S.C.C.A.N. 730 ................................15

Proposed Lead Plaintiff Camelot Event Driven Fund, A Series of Frank Funds Trust ("Camelot") respectfully submits this Motion and Memorandum of Law pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4(a)(3)(B), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), in support of its motion for the entry of an Order: (i) appointing Camelot as Lead Plaintiff on behalf of a Class (as defined herein) of all persons and entities who held Class A common stock of Alta Mesa Resources, Inc. f/k/a Silver Run Acquisition Corporation II ("Silver Run II" or the "Company") at the close of business on January 22, 2018 (the "Record Date"); (ii) approving Camelot's selection of Labaton Sucharow LLP ("Labaton Sucharow") as Lead Counsel for the Class; and (iv) granting such other and further relief as the Court may deem just and proper.[1]

## PRELIMINARY STATEMENT

Camelot respectfully submits that it should be appointed Lead Plaintiff on behalf of all investors or entities who purchased or otherwise acquired Silver Run II securities during the Class Period (the "Class"), and who were damaged as a result of defendants' alleged violations of the federal securities laws. The *Plumbers* Action alleges violations of the Securities Exchange Act of 1934 against Silver Run II and certain of its executive officers (collectively, the "Defendants").

---

[1] Three securities class actions have been filed to-date. The first action, *Plumbers and Pipefitters National Pension Fund v. Alta Mesa Resources, Inc.*, No. 19-cv-00920 (S.D.N.Y. Jan. 30, 2019) (the "*Plumbers* Action") was filed in this Court. Subsequent to the filing of the *Plumbers* Action, two additional actions were filed in the United States District Court for the Southern District of Texas, *Camelot Event Driven Fund, A Series of Frank funds Trust v. Alta Mesa Resources Inc. f/k/a Silver Run Acquisition Corporation II*, No. 19-cv-00957 (S.D. Tex. Mar. 14, 2019) (the "*Camelot* Action"), and *FNY Partners Fund LP v. Alta Mesa Resources, Inc. f/k/a Silver Run Acquisition Corporation II*, No. 19-cv-01027 (S.D. Tex. Mar. 19, 2019) (the "*FNY* Action"). Because Camelot anticipates all three actions will ultimately proceed as one consolidated action, Camelot has simultaneously filed a motion and supporting materials for lead plaintiff appointment in this Court and the S.D. Tex.

Pursuant to the PSLRA, this Court must appoint the "most adequate plaintiff" to serve as Lead Plaintiff.  15 U.S.C. § 78u-4(a)(3)(B)(i).  In that regard, the Court is required to determine which movant has the "largest financial interest" in the relief sought by the Class, and also whether such movant has made a *prima facie* showing that it is a typical and adequate class representative under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23").  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

Camelot respectfully submits that it should be appointed Lead Plaintiff because it has a substantial financial interest in this litigation and has made the requisite showing of typicality and adequacy required by the standards of the PSLRA.  As set forth in detail below, Camelot incurred $58,795.88 in losses as a result of its Class Period transactions in Silver Run II securities as calculated on a last-in-first-out ("LIFO") basis.[2]  In light of this significant loss, Camelot has a substantial financial interest in directing this litigation and recovering losses attributable to Defendants' violations of federal securities laws.

In addition to asserting a substantial financial interest in this litigation, Camelot also meets the typicality and adequacy requirements of Rule 23 as required by the PSLRA, because its claims are typical of those of absent Class members, and because it will fairly and adequately represent the interests of the Class.  Furthermore, Camelot fully understands the Lead Plaintiff's obligations under the PSLRA and is willing and able to undertake the responsibilities entailed in acting as Lead Plaintiff to guarantee the vigorous prosecution of this case.

---

[2]   A copy of the Certification of Brian J. Frank, as President of the Frank Funds Trust, of which Camelot is a series ("Certification"), is attached as Exhibit A to the Declaration of Christopher J. Keller (the "Keller Decl.").  The Certification sets forth all transactions of Camelot in Silver Run II securities during the Class Period.  In addition, a table reflecting the calculation of financial losses sustained by Camelot on its Class Period transactions in Silver Run II securities ("Loss Analysis") is attached as Exhibit B to the Keller Decl.

Camelot has also demonstrated its adequacy through its selection of Labaton Sucharow as proposed Lead Counsel on behalf of the Class. Labaton Sucharow is a nationally recognized securities class action firm which has recovered billions of dollars for the benefit of injured investors, and has the expertise and resources necessary to handle litigation of this complexity and scale.

Accordingly, Camelot requests that the Court appoint it Lead Plaintiff and otherwise grant its Motion.

## **FACTUAL BACKGROUND**

Silver Run II was formed in 2016 as a blank check company organized under the laws of Delaware. Blank check companies do not have established businesses or operations, but rather, are formed for the purpose of effectuating a merger or acquisition with another firm or business entity. Stockholders in blank check companies depend on management to honestly provide accurate information about any contemplated transactions.

On or about March 24, 2017, Silver Run II carried out an initial public offering, selling 103.5 million ownership units to investors for gross proceeds of $1.035 billion (the "IPO"). Each unit was priced at $10 and consisted of one share of Class A common stock and one-third of a warrant to purchase Class A shares. Each whole warrant entitled the holder to purchase one share of Silver Run II Class A common stock at $11.50 per share. The IPO was sponsored by Riverstone, a New York-based energy sector private equity firm.

Pursuant to the IPO prospectus, Silver Run II was required to acquire a target business with an aggregate fair market value of at least 80 percent of the assets held in trust from the IPO proceeds and to do so within two years of the March 2017 IPO. In the event Silver Run II did not complete an initial business combination, the Company was obligated to redeem 100 percent of its outstanding public shares. Moreover, shareholders could redeem their shares at the time of

the initial business combination if they did not want to retain a continuing interest in the business after the transaction. If enough shareholders redeemed their shares, a deal would not be economically feasible.

While Silver Run II did not identify any target companies at the time of the IPO, the offering materials stated that the Company planned to pursue an acquisition that would "capitalize on the ability of [its] management team and the broader Riverstone platform to identify, acquire and operate a business in the energy industry that may provide opportunities for attractive risk-adjusted returns." The IPO offering materials also represented that Silver Run II would leverage its industry experience and insider knowledge to acquire "fundamentally sound" assets that were underpriced and offered Silver Run II investors attractive investment returns.

In August 2017, Silver Run II announced that it had entered into an agreement, subject to shareholder approval, to merge with two privately held companies, Alta Mesa and Kingfisher, in a deal initially valued at $3.8 billion. Alta Mesa was an oil and gas exploration and production company operating in the STACK play in the Anadarko Basin area of Oklahoma. Kingfisher specialized in the gathering, processing, and marketing of hydrocarbons from oil and gas producers. The two companies were closely related and shared overlapping and affiliated owners. Kingfisher had been built to service Alta Mesa, and nearly 97 percent of Kingfisher's revenues derived from production out of wells operated by Alta Mesa for the year ended December 31, 2016.

On January 19, 2018, in order to secure shareholder support for the Acquisition, Silver Run II issued a materially false and misleading Definitive Merger Proxy Statement pursuant to Section 14(a) of the Exchange Act (the "Proxy"). The Proxy, which recommended that Silver Run II's shareholders vote in favor of the Acquisition, included false and/or misleading

statements of fact and omitted facts necessary to make the statements made therein not false or misleading in contravention of Section 14(a) of the Exchange Act and SEC Rule 14a-9.

Among other misrepresentations, the Proxy materially overstated the value of the assets to be acquired via the Acquisition and claimed that both Alta Mesa and Kingfisher were poised for substantial near-term growth.  For example, the Proxy failed to disclose operational setbacks, customer uncertainty and predictable well shutdowns as a result of planned projects commenced in late 2017, while representing: (i) that Alta Mesa was positioned to achieve a 2018 average net daily production of 38.51 MBOE/d,[3] an 85 percent increase over its estimated 2017 net daily production of 20.84 MBOE/d, and a 2018 adjusted EBITDA(X)[4] of $358 million, a 131 percent increase over Alta Mesa's 2017 estimated adjusted EBITDA(X) of $155 million; and (ii) that Kingfisher was positioned to achieve 2018 adjusted EBITDA[5] of $185 million, a 340 percent increase over Kingfisher's 2017 estimated adjusted EBITDA of $42 million.

As a result of the false and misleading Proxy, which was used to induce stockholder action and resulted in substantial harm to Plaintiff and Silver Run II's other shareholders on the Record Date, Silver Run II shareholders were prevented from making an informed decision on whether or not to redeem their shares and voted in favor of the Acquisition on February 6, 2018. The redeemable Class A common shares were valued at approximately $10 per share at the time of the Acquisition.

On February 9, 2018, Silver Run II issued a release announcing that the Acquisition had closed.

---

[3]     MBOE/d stands for one thousand barrels of oil equivalent ("BOE") per day.
[4]     EBITDA(X) is an indicator of financial performance used by oil and gas exploration companies. The acronym stands for Earnings before Interest, Taxes, Depreciation (or Depletion), Amortization, and Exploration expenses.
[5]     EBITDA is a widely used indicator of financial performance used by companies across all sectors.  The acronym stands for Earnings before Interest, Taxes, Depreciation, and Amortization.

Unbeknownst to Silver Run II shareholders on the Record Date, as well as subsequent purchasers of Silver Run II securities, however, the true quality of the assets acquired in the Acquisition were vastly lower than touted by Silver Run II in the Proxy. The fraudulently undisclosed actual value of these assets (or complete lack thereof) would be only revealed over the Company's next several reporting periods, sending the value of Silver Run II securities into free fall, thereby seriously harming investors.

On March 29, 2018, less than two months after the closing of the Acquisition, Silver Run II issued a release announcing that the EBITDA and production estimates provided in the Proxy were materially overstated. The release stated that Kingfisher was expected to post only $102.5 million in EBITDA at the midpoint of 2018, 46 percent below the 2018 EBITDA estimate of $185 million provided in the Proxy. Similarly, Alta Mesa was expected to post an average net daily production of only 35.5 MBOE/d at the midpoint for the year, 8 percent below the production figures provided in the Proxy.

Chappelle, the new CEO of the combined business (and former CEO of Alta Mesa), stated during a conference call to discuss Silver Run II's results that multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher, which pushed the Company's timeline for growing its pipeline business back by six months and a possible public offering of the asset "perhaps" into 2019. Even though the setbacks had not been disclosed in the Proxy, Chappelle admitted that these "setbacks" began in "late 2017." Despite revealing these dire setbacks, Chappelle stated that: "our vision for growth remains strong . . . . We believe our margins are going to continue to expand . . . ."

On this news, Silver Run II Class A common stock fell from its March 29, 2019 closing price of $8.00, to close at $7.36 on the following trading day, April 2, 2018, a decline of 8

percent.  The stock continued to decline for the following two days, closing at $6.99 on April 4, 2018.  Altogether, this represented a 16.6 percent decline from the stock's closing price of $8.38 on March 28, 2018.

On May 14, 2018, the Company disclosed that net production was still languishing at 24 MBOE/d, *37 percent* below the Company's 2018 projections.  During the Company's accompanying conference call with investors, however, Chappelle again attempted to falsely assuage investor concern: "We are reaffirming our FY 2018 guidance.  We have confidence in presenting operating results, such as production, revenue, expenses as those numbers will not change."

On August 14, 2018, Silver Run II provided its second quarter 2018 financial results, again posting disappointing results and slashing its outlook in the midst of numerous operational setbacks.  Rather than the hyperbolic growth portrayed in the Proxy, Silver Run II revealed that Alta Mesa's oil production had actually declined sequentially during the quarter and that it now expected to achieve average daily net production of only 30.0 MBOE/d at the midpoint for 2018, 22 percent below the estimates provided in the Proxy.  Far from the reliable and consistent well production represented to investors in the Proxy to induce them to approve the Acquisition, Silver Run II revealed that throughout 2018 Alta Mesa's wells had suffered from repeated "shut-ins" or restricted production caps, resulting in an average daily loss of thousands of BOE.

On an earnings call to discuss the results, Alta Mesa's Vice President of Operations revealed that the shut-ins resulted from work done or planned "back in the fourth quarter of '17," which problems "linger[ed] into the first quarter of '18."  Notwithstanding the fact that these projects were planned and implemented prior to the Acquisition, their adverse effects were omitted from the Proxy.  Furthermore, Silver Run II revealed that its Kingfisher operations were

7

not on track to achieve even the drastically reduced March 2018 guidance.  Notably, Silver Run II refused to provide any revised guidance for Kingfisher during the call, an indication that third-party producers had largely abandoned the use of Kingfisher's pipeline services.  The Proxy had valued the consideration to be paid for Kingfisher at over $1.4 billion (including $800 million in cash) based, in part, on a 2018 EBITDA estimate of $185 million.   Kingfisher, however, actually generated only $9.2 million of EBITDA in the first six months of 2018, which implied a full-year EBITDA of only $18.4 million, more than 90 percent below the estimate provided in the Proxy.

On this news, the price of Silver Run II Class A common stock fell from its August 13, 2018 closing price of $6.00, to close at $4.77 on August 14, 2018, a decline of 21 percent.  The stock continued to decline on the following trading day, closing at $4.34 on August 15, 2018.  Altogether, this represented a decline of 28.6 percent from the stock's August 13, 2018 closing price.

On November 13, 2018, Silver Run II issued a release providing its third quarter 2018 financial results.  Production would still languish at 33.4 MBOE/d, and the Company would only report consolidated EBIDTAX of $83.8 million—well below the estimates in the Proxy.  The release also stated that McCabe, the Company's post-Acquisition CFO, was retiring.  In the accompanying conference call with investors, however, Chappelle continued to tout the "quality" of Silver Run II's assets.

On this news, the price of Silver Run II Class A common stock fell from its November 13, 2018 closing price of $2.82, to close at $2.40 on November 14, 2018, a decline of 15 percent.  Over the next several trading days, the stock continued to decline, closing at $2.18 on November

16, 2018.  Altogether, this represented a decline of 22.7 percent from the stock's November 13, 2018 closing price.

Approximately one month later, on or about December 27, 2018, Silver Run II announced the sudden resignation of Chappelle, and Michael E. Ellis ("Ellis"), Vice President and Chief Operating Officer-Upstream.

Finally, on February 25, 2019 Defendants announced that they would delay the announcement of Silver Run II's full year 2018 financial results due to a determination that the Company had ineffective control over financial reporting due to an identified material weakness in both the design of its controls and the execution of its control procedures.  The Company also announced that it expected to record material, non-cash asset impairment charges to both its upstream and midstream segments in the fourth quarter of 2018, totaling $3.1 billion—triple the value of the Company at the time of the IPO, and nearly the entire value of the $3.8 billion Acquisition.  In addition, the Company projected that 2019 production estimates would be on average of 30.5 MBOE/d—over 100 percent below the estimates of 68.9 MBOE/d as contained in the Proxy.  Finally, the Company announced that it had "reduced [its] active rig count to zero by the end of January."

On this news, the price of Silver Run II Class A common stock fell from its February 25, 2019 closing price of $0.91, to close at $0.24 on February 26, 2019, a decline of 63 percent.  The stock continued to decline on the following trading day, closing at $0.23 on February 27, 2019.  Altogether, this represented a decline of 75 percent from the February 25, 2019 closing price.

The value of the Silver Run II securities held by Camelot and other members of the Class declined substantially in value subsequent and due to the approval of the Acquisition, causing economic loss and damages as the truth about Alta Mesa and Kingfisher and the Defendant's

false and misleading statements, including those in the Proxy, were revealed slowly over time. By February 2019, the price of Silver Run II Class A common stock had fallen astronomically from a Class Period high of $10.73 per share, trading at well below $.50 per share. This number also represents over a 95 percent decline from the price shareholders would have received had they redeemed their shares instead of approving the Acquisition.

## ARGUMENT

### I.   CAMELOT SHOULD BE APPOINTED LEAD PLAINTIFF

Camelot respectfully submits that it should be appointed Lead Plaintiff because it filed the instant motion in a timely manner, has a substantial financial interest in this litigation, and satisfies the typicality and adequacy requirements of Rule 23.

#### A.   The PSLRA Standard for Appointing Lead Plaintiff

The PSLRA provides a straightforward, sequential procedure for selecting a lead plaintiff for "each private action arising under [the Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." *See* 15 U.S.C. § 78u-4(a)(l); *see also* 15 U.S.C. § 78u-4(a)(3)(B) (setting forth procedure for selecting lead plaintiff). First, Section 21D(a)(3)(A)(i) of the Exchange Act, as amended by the PSLRA, specifies that:

> Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class –
>
> (I) of the pendency of the action, the claims asserted therein, and the purported class period; and
>
> (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.

15 U.S.C. § 78u-4(a)(3)(A)(i).

Next, pursuant to the PSLRA, a court is to consider any motion made by class members to serve as Lead Plaintiff and appoint the "most adequate plaintiff." 15 U.S.C. § 78u-4(a)(3)(B)(i). In adjudicating a lead plaintiff motion, a court shall adopt a presumption that the "most adequate plaintiff" is the person or group of persons who: (1) filed a complaint or timely filed a motion to serve as Lead Plaintiff; (2) has the largest financial interest in the relief sought by the class; and (3) who otherwise satisfies the requirements of Rule 23. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I); *Foley v. Transocean Ltd.*, 272 F.R.D. 126, 127 (S.D.N.Y. 2011). This presumption may be rebutted only by "proof" that the presumptively most adequate plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *see also Ho v. NQ Mobile, Inc.* (*NQ Mobile*), No. 13-Civ.-7608(WHP), 2014 WL 1389636, at *2 (S.D.N.Y. Apr. 9, 2014) (same) (citations omitted); *Micholle v. Ophthotech Corp.*, No. 17-CV-210 (VSB), 2018 WL 1307285, at *4 (S.D.N.Y. Mar. 13, 2018). Under the framework established by the PSLRA, Camelot is the most adequate plaintiff and should be appointed Lead Plaintiff.

### B. Camelot Is The "Most Adequate Plaintiff"

#### 1. Camelot's Motion Is Timely

Camelot filed this motion to serve as Lead Plaintiff in a timely manner. Pursuant to 15 U.S.C. § 78u-4(a)(3)(A)(i), the plaintiff in the above-captioned action caused notice regarding the pending nature of this case to be published on *Business Wire,* a widely-circulated, national, business-oriented news wire service, on January 30, 2019. *See* Notice, Keller Decl., Ex. C. Thus, pursuant to the PSLRA, any person who is a member of the proposed Class may apply to be appointed lead plaintiff within sixty days after publication of the notice, *i.e.*, on or before

March 29, 2019. Camelot filed its motion seeking appointment as Lead Plaintiff within this deadline and thus has satisfied the procedural requirements of the PSLRA.

### 2. Camelot Has a Substantial Financial Interest

The PSLRA requires a court to adopt the rebuttable presumption that "the most adequate plaintiff . . . is the person or group of persons that . . . has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii); *Kemp v. Universal Am. Fin. Corp.*, No. 05 Civ. 9883 (JFK), 2006 WL 1190691, at *2 (S.D.N.Y. May 1, 2006).

Camelot incurred a substantial loss of $58,795.88 on its relevant transactions in Silver Run II Class A common stock on a LIFO basis during the Class Period. *See* Loss Analysis, Keller Decl., Ex. B; *see also Faig v. Bioscrip, Inc.*, No. 13 Civ. 06922 (AJN), 2013 WL 6705045, at *2 (S.D.N.Y. Dec. 19, 2013) (finding the movant with the largest financial interest to be the presumptive "most adequate plaintiff"). Accordingly, Camelot has a substantial financial interest as a qualified movant seeking Lead Plaintiff status, and is the presumptive "most adequate plaintiff." *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii); *Randall v. Fifth St. Fin. Corp.*, No. 15-cv-7759 (LANK), 2016 WL 462479, at *1 (S.D.N.Y. Feb. 1, 2016) (same); *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, 269 F.R.D. 291, 296 (S.D.N.Y. 2010) (same).

### 3. Camelot Satisfies Rule 23's Typicality and Adequacy Requirements

The PSLRA further provides that in addition to possessing the largest financial interest in the outcome of the litigation, a lead plaintiff must "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure." *See In re Third Ave. Mgmt. LLC Sec. Litig.*, No. 16-cv-02758 (PKC), 2016 WL 2986235, at *1 (S.D.N.Y. May 13, 2016). At the lead plaintiff selection stage all that is required to satisfy Rule 23 is a preliminary showing that the lead plaintiff's claims are typical and adequate. *See Kux-Kardos v. VimpelCom, Ltd.*, 151 F. Supp. 3d

471, 477 (S.D.N.Y. 2016); *see also Faig*, 2013 WL 6705045, at *3 ("[A]t this stage of the litigation, a moving plaintiff must only make a preliminary showing that the adequacy and typicality requirements have been met.") (citation omitted). Here, Camelot unquestionably satisfies both requirements.

### (a) Camelot's Claims Are Typical of Those of the Class

The Rule 23(a) typicality requirement is satisfied when a plaintiff's claims arise from the same event, practice or course of conduct that gives rise to other class members' claims, and plaintiff's claims are based on the same legal theory. *See Faig*, 2013 WL 6705045, at *3. Rule 23 does not require the lead plaintiff to be identically situated with all class members. *Id.*

Camelot's claims are typical of the claims asserted by the proposed Class. Like all members of the Class, Camelot alleges that Defendants made material misstatements and omissions regarding revenues and expenses on its long-term service projects in violation of the federal securities laws. Camelot, as did all of the members of the Class, held Silver Run II securities on the Record Date in reliance on Defendants' alleged misstatements and omissions and was damaged thereby. Because Camelot's claims arise from the same course of events as do the claims of other class members, the typicality requirement is satisfied. *See Ophthotech*, 2018 WL 1307285, at *6.

### (b) Camelot Satisfies the Adequacy Requirement of Rule 23

Camelot likewise satisfies the adequacy requirement of Rule 23. The adequacy of representation requirement of Rule 23(a)(4) is satisfied when a representative party establishes that it "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts in this District assess a movant's adequacy based on: "(1) the size, available resources and experience of the proposed lead plaintiff; (2) the qualifications of the proposed class counsel; and (3) any potential conflicts or antagonisms rising among purported class members." *In re*

*Elan Corp. Sec. Litig.*, No. 1:08-cv-08761-AKH, 2009 WL 1321167, at *2 (S.D.N.Y. May 11, 2009) (citing *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, No. 08 MDL No. 1963(RWS), 2009 WL 50132, at *8 (S.D.N.Y. Jan. 5, 2009)).

Camelot will fairly and adequately represent the interests of the proposed Class, Camelot unquestionably has resources sufficient to pursue the Action to a successful conclusion. Camelot has also retained counsel highly experienced in prosecuting securities class actions vigorously and efficiently, *see infra* at Section III, and timely submitted its choice to the Court for approval, in accordance with the PSLRA. *See* 15 U.S.C. §§ 78u-4(a)(3)(A)(i)(II) and (B)(v).

Furthermore, no antagonism exists between Camelot's interests and those of the absent Class members; rather, the interests of Camelot and Class members are squarely aligned. Camelot suffered substantial losses due to Defendants' alleged misconduct and, therefore, has a sufficient interest in the outcome of this case to ensure vigorous prosecution of this action. In addition, Camelot has retained counsel highly experienced in prosecuting securities class actions vigorously and efficiently, and timely submitted its choice to the Court for approval, in accordance with the PSLRA. *See* 15 U.S.C. §§ 78u-4(a)(3)(A)(i)(II) and (B)(v).

Finally, there is no proof that Camelot is "subject to unique defenses that render such plaintiff incapable of representing the class," because no such proof exists. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Accordingly, Camelot satisfies the adequacy requirement.

## II.   CAMELOT'S SELECTION OF LEAD COUNSEL MERITS APPROVAL

The PSLRA vests authority in the lead plaintiff to select and retain lead counsel, subject to the court's approval. *See* 15 U.S.C. § 78u-4(a)(3)(B)(v); *In re Cendant Corp. Litig.*, 264 F.3d 201, 276 (3d Cir. 2001) (stating that "the Reform Act evidences a strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection and counsel retention"). Consistent with Congressional intent, a court should not disturb the lead plaintiff's

choice of counsel unless it is "necessary to protect the interests of the plaintiff class." *See* H.R. Conf. Rep. No. 104-369, at 35 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 734.

Here, Camelot has selected the law firm of Labaton Sucharow to represent the Class. Labaton Sucharow has excelled as lead counsel in numerous actions on behalf of defrauded investors, including noteworthy cases in this District. For example, Labaton Sucharow served as lead counsel in *In re American International Group, Inc. Securities Litigation*, No. 04-cv-8141 (S.D.N.Y.), in which it achieved a recovery totaling more than $1 billion for injured investors, and secured a $294.9 million recovery in *In re Bear Stearns Cos., Inc. Securities, Derivative, & ERISA Litigation*, No. 08-md-1963 (S.D.N.Y.), in which the Firm served as co-lead counsel. Labaton Sucharow also served as co-lead counsel in *In re Satyam Computer Services Ltd. Securities Litigation*, No. 09-md-2027 (S.D.N.Y.), through which it helped recover from the company and its auditors a total of $150.5 million for class members, and secured a $170 million recovery as co-lead counsel in *In re Fannie Mae 2008 Securities Litigation*, No. 08-cv-7831 (S.D.N.Y.). Labaton Sucharow presently serves as lead or co-lead counsel in several significant investor class actions. *See* Labaton Sucharow Firm Resume, Keller Decl., Ex. D.

In light of the foregoing, the Court should approve Camelot's selection of Labaton Sucharow as Lead Counsel for the Class. The Court can be assured that, by approving Camelot's choice of counsel, the Class will receive the highest caliber of representation.

## CONCLUSION

For the foregoing reasons, Camelot respectfully requests that the Court issue an Order (1) appointing Camelot as Lead Plaintiff for the Class; (2) approving Camelot's selection of Labaton Sucharow LLP as Lead Counsel for the Class; and (3) granting such other relief as the Court may deem just and proper.

DATED: April 1, 2019                                          Respectfully submitted,

/s/ *Christopher J. Keller*

**LABATON SUCHAROW LLP**
Christopher J. Keller
Eric J. Belfi
Francis P. McConville
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
ckeller@labaton.com
ebelfi@labaton.com
fmcconville@labaton.com

*Counsel for Lead Plaintiff Movant Camelot Event Driven Fund, A Series of Frank Funds Trust and Proposed Lead Counsel for the Class*